For today that is Cheruvu v. Healthnow New York. I'm not sure if I'm pronouncing that right, but somebody will correct me, I hope, if I'm wrong. Okay, so before you start, Mr. Walsh, you reserve three minutes for rebuttal, so that's fine. That gives you nine minutes out of the game, right? And then on the other side, Mr. McLaren is going to go for ten, Mr. Feinstein, or Feinstein, I'm not sure which, you'll correct me, for one, and Mr. Molloy for one. Is that right? Okay, so I've got my score card. And with that, Mr. Walsh, you may proceed. Thank you, Your Honor. May it please the Court, Counsel. I'm privileged to represent Dr. Sri Krishna Cheruvu. You pronounced it correctly, Judge. And I have to say at the beginning, he's a good doctor. He's not a bad guy. He treats people with opioid addiction. There was another big case out of the Western District with somebody who was over-prescribing, allegedly. This is different. This really involved discussion he was having with an insurance company about how to bill the way he treats his patients. And then it quickly ended up that he was on the wrong side of the state and federal criminal prosecution. So I think we get all that, but I guess the issues are sort of technical ones, I think, which is whether or not the defendants that you named are in fact state actors, right? And the standard is whether they were willful participants in joint activity with state officials. So the New York Medicaid Fraud Unit was part of this task force. But they had to share a common goal to violate the plaintiff's rights. So it's not just that they were in joint activity. And the activity that you're alleging here is basically that they provided information and testified. Do you think that they were involved in the decision to charge? They were involved in, using their own words, bringing this case through the task force to the prosecutors. They're on this official task force. They call it that, not me. And they want to be on that task force so they have the influence they seek to get these people prosecuted. And with that, they share a common goal. And they stated it precisely in response to an indictment, getting this guy out of practice. That comes out of the mouth of a vice president of Blue Cross after they found out about his superseding indictment. They wanted him to pay a lot of money, and they wanted to get him out of practice. That was the goal. And they succeeded. And his practice is gone. And he spent a lot of money defending himself, and at the end of the day, he won. It reminds me, and I think I may have used it in my earlier brief, the Ray Donovan case from years ago. Where do I go to get my reputation? So I can't figure out how to more plausibly allege willful participation in joint activity to say that they were part of this task force group. But that's all you say. That's the problem. That's all you really say. They were part of a group. But you don't really say what it is that they did. I mean, they don't have charging authority, clearly, right? Well, how those charging decisions were made, Your Honor, I don't know. That's true. But I do know that they took credit for bringing this into the task force and getting this man charged. And they congratulated themselves for doing it. So whatever influence they had in that task force group needs to get sorted out in discovery. It's premature. If a witness reported a crime to the district attorney's office and that leads to a prosecution and then goes on Twitter and says, I'm really glad that I did this and I'm proud that I helped bring this person to justice. That wouldn't make them a state actor, right? Of course not. No. This is different. So why is this different? These are the three main health insurance companies in western New York. They sought and obtained a seat on this task force because they wanted to have the influence to bring doctors that don't toe the line with them and put pressure on them with prosecutions. So one of the reasons in this case it was important, and they continued to do that, even though they had their own documents that came out during the trial that showed that the theory of why he was wrong and what he was doing was completely refuted by their own documentation. But when this issue came up, they were discussing it about the codes. And he said to them, tell me what code to bill, I'll bill it. And they said, well, don't do it. Just keep billing it. There's an email. Just keep billing it the way you were doing it, and we'll sort it out later. Fine. They went right to the task force and started the prosecution. They didn't wait for that. And what did he do? He said, well, I'm not going to dig myself a bigger hole. I'm not going to take Blue Cross patients anymore because I don't want to be a lot of trouble. That was the problem because what they usually do when they have these SIU, these special investigation units come in to claw back money is they make a determination, and then when the doctor has more patients coming and more bills, they just offset it. With Dr. Cheruver, they weren't going to be able to do that because he stopped taking their patients. He wasn't going to have more bills. Well, what's to show that they were trying to violate the doctor's rights rather than vindicate their own rights to pay only for insurable claims? That's a difficult question, Your Honor. It's a difficult question to answer on a Rule 12b-6 motion. What's to say that there is to say they knew. For a perfectly good reason. But they knew. They wanted to do this, and then is it plausible to say that they did something that is clearly in their financial interest and probably part of their responsibility and that they did something for evil reasons? Because they knew that this billing code thing was, at most, maybe a dispute under their contract. At most. They knew that this man didn't have the intent to do it. He met with them and said, this is why I think I'm doing it the right way. If I'm not, tell me how to do it. And they wouldn't. So what they wanted is to get money out of them and then to put them out of practice. That's, to me, an illegitimate purpose. It's the common goal that was being achieved by the prosecutors. That's what we've alleged. And I think we've given enough facts to show how it was implausible for them to think that that should be a criminal matter. And at the end of the day, when that evidence came out during the trial, I mean, I understand there's a point made in one of the briefs. It has to be state officials. Of course it does. And there are state officials involved. But to tell the story, I have to tell what happened in the federal trial. Because that's how they found out that there were these memos out there where they knew that he could have other doctors bill while he was away that worked for him. And there was nothing wrong with that. And they knew that he had a legitimate interest in billing that code. It's not clear. It seems like they realized that what they thought was not clearly stated in regulation. At least the email traffic that you pointed to suggested that what they thought they knew all along was called into question by the lack of clear guidance in the regs. It's not the regulations. It's their own manuals that they looked at and said there's nothing in our manuals that says that he's got to do it this way. And so they knew that. But this was a lot easier than filing a lawsuit against them to try to get the money. They had the influence because they're in the task force. That's what creates the state action. Can I ask you quickly to turn to the other claims, the race discrimination claims? Oh, yeah. I mean, it seems that here, I mean, all you've basically alleged is that Dr. Cheru is an Asian-American, Indian-American, Asian-Indian-American, I think is what you said, and that they had an intent to discriminate against him. You don't provide anything else to support an inference of discrimination. What is there to conclude that this was motivated by his race or his ethnicity? The only thing we can allege, Your Honor, and the only thing we did allege was that it's counter to the stereotype that he'd be a quiet Indian doctor, that he would fight them. But what does that mean? I understand. But that's all I have. I don't have anybody calling him a name or anything like that. No, but what normally one would have in a situation like this was to show that only Indian-American doctors are ever prosecuted for this or that others who did the same thing weren't prosecuted and were of different racial or ethnic origins. There's nothing like that. I don't have a comparator because nobody else I know has been prosecuted like this. So I can't come up with a comparator. I'll reserve my time. Thank you. Okay. So you have three minutes for rebuttal. We'll now hear from Mr. McLaren for his statement. I'm pronouncing that right? Yes, Your Honor. May it please the court. My name is Michael McLaren. I'm here on behalf of HealthNow and Susan Schultz with respect to this matter. I think the court obviously hit the nail on the head in terms of the issue in front of you, which is state action. And there's actually two big issues, I think. One is state action. The other, combined with that, is the fact that the plaintiff's complaint really here focuses almost exclusively on the actions of federal agents. The U.S. attorney, the FBI, and how they handled an investigation, how they handled prosecution. And obviously, those federal agents are not subject to 1983, and there can't be state action in terms of cooperating with them. The allegations that there were some state actors. You're saying there can't be state action in cooperating with them? I think that's the whole argument, is that there maybe can be. Well, no. I'm drawing the distinction between cooperating with state actors and federal actors. Obviously, there can be state action cooperating with state actors. Well, there's a task force, right? Well, the prosecution was not brought by a task force. The prosecution was brought by the U.S. attorney. Right. So that's the distinction you're making, is that because the prosecution was brought by the U.S. attorney, that that pretty much ends the inquiry? It ends the inquiry. It definitely ends the inquiry as to the malicious prosecution claim because, as Your Honor pointed out, the task force and those state agents can be involved in the charging of a federal indictment. They don't handle the federal grand jury. So that ends that issue. The issue then is whether or not there was state action involved in the sort of the investigation and the false arrest, which arguably there could be. But if you look at the facts here, the facts clearly don't support that. And I think one of the things the court has to do, unfortunately, is parse through a lot of the verbiage in this complaint to get down to the facts. And when you do that, you look at the facts that are, the specific factual allegations are that in November of 2011, Susan Schultz made an unannounced visit to Dr. Sherwood's office. Obviously, when you're investigating fraud, you're not going to announce that you're showing up two weeks ahead of time. So there's nothing wrong with that. The next allegation with respect to involvement by any of the defendants is that there was a meeting in December of 2011 with the FBI. So they brought to the FBI's attention Dr. Sherwood's billing practices. And as the court pointed out before, cooperation with law enforcement, bringing suspected criminal activity to law enforcement certainly does not give rise to state action. Then notably, Your Honors, there is no allegation of any involvement by any of the defendants in 2012. None at all. 2013, there is no allegation of any involvement by the defendants with any state or federal actor up until December 16th of 2013. In the intervening time, earlier in 2013, the FBI conducted its own raid. That's in the complaint. Sherwood was then arrested May 29th of 2014. So that is almost two and a half years after the last alleged involvement by any of these defendants with any federal or state official involving the arrest. And what Judge Villarno and Judge Fascio held below was that these conclusory allegations of concerted action are not enough. And if you look at the specific facts pled, clearly it's more plausible, and there's an indication that there's independent judgment by these law enforcement officials to conduct this raid, to arrest him, to then indict him. And it wasn't until after the first indictment that the next allegation against any of these defendants comes up, which was testimony in front of the federal grand jury in late December, in December of 2014. So clearly what the plaintiff has failed to do here is plead specific facts that would allow this court to arrive at a conclusion that it's plausible that there was state action here. And again, as Your Honor pointed out, one of the things the plaintiff has utterly failed to do, and it's not in the complaint, is allege that there was willful collaboration and a shared unlawful goal to violate the plaintiff's constitutional rights. There are no facts pled at all that would support that. Clearly, participation on a task force does not give rise to state action. That's true with respect to an insurance fraud task force, an organized crime task force, any other type of task force, a drug task force that's out there. You wouldn't want to expose a private citizen participating in those law enforcement activities to state action virtually by cooperating on a task force. What if the private actors provide false information for purposes of their own profit to the investigative arms, organs of the state? And isn't that enough? It's not enough to create a federal claim. That certainly could give rise to a state law claim for intentional affliction of economic harm, a tortious interference with contract type claim possibly. But it's not enough in the federal context because you have to have, the goal has to be shared. It has to be a common goal between a private actor and a state actor, not a federal actor, a state actor. The goal has to be to bring false charges. They don't have to have the same reason for doing that, do they? I mean, the private actor can wish to do it in order to eliminate excessive insurance claims that are valid. Well, I think that's right, Your Honor. But the question you asked was whether or not a private entity who has an unlawful motive to generate profits could be subject to being a state actor. And I don't think that's- Mr. Sandby, I was asking, can they be liable federally if they advance that interest by providing false information to the authorities on which the authorities act? Well, I think it has to be more than simply false information. This court has held on numerous occasions that simply providing false information, reporting falsely a crime to law enforcement, and the law enforcement acting on that does not give rise to state action. You have to have more involvement than that. What if the doctor had been arrested promptly after the report of false information by an insurance company? If- If he'd been arrested promptly, no investigation other than that? If there was some evidence or it was plausible, and there were facts pled that made it plausible, that not only did the private actor, but also the state actor have an unlawful goal of a constitutional violation, then I think maybe. It would certainly make this a cleaner case. Here you have a two and a half year lag between the last alleged contact between, of any of the defendants. With the government authorities conducting investigations of their own. Right. The FBI did its own raid. There's no allegation that any of the defendants were involved in that raid. There's no allegation at all that the defendants were involved in the decision to charge. The decision to bring this to a grand jury twice. There's no allegation at all in that. And I think it's also important to note, your honors, that there's no allegation that a district attorney was involved. That a state trooper was involved, state law enforcement was involved. That resulted in any of these federal claims. And again, I would point out that without the involvement of a state actor as opposed to a federal actor, you cannot have state action. The claim here may well have been a Bivens action. If the plaintiff was unhappy with how the prosecution and the investigation was handled. But he settled his criminal action and waived all of those claims. So what he's done here is a complete stretch to try to get retaliation against people that were just minimally or tangentially involved in this issue. And he simply has, if you parse through the complaint, as opposed to the excess verbiage in there, the plaintiff hasn't alleged facts which make it plausible that these defendants convinced the US attorney to bring fraud charges. If you even get to the issue of Thompson or the most prosecution, I would just point out quickly that, again, there's no indication that any of the defendants had anything at all to do with the initiation of the prosecution. The only allegation is the complaint that they brought Cherivu to the attention of investigators. And I would also argue, Your Honor, that the complaint itself establishes probable cause. Cherivu admits that bills were submitted under his name while he was out of the country. That in and of itself is at least arguable probable cause that there's something fishy going on. I see my time is up, if there's no further questions. All right, thank you, Mr. McFarland. Thank you, Your Honor. We'll hear from Mr. Feinstein. Where's Feinstein? You're going to let me know. I guess it's Feinstein, but I'm not very picky. Thank you, Your Honors. Very quickly, I mean, I think as the court pointed out, merely sitting on a task force is not enough. And this is where it really comes down to, particularly with respect to my client, Excellus, as to which there's virtually no particularized allegations. Also, to Judge Jacobs' last point, there's a presumption of prosecutorial independence. And so even if he alleges that the defendants had some self-interest, which big surprise, people who report crimes frequently have self-interest, particularly in regulated industries. So I don't think the fact that they had a self-interest gets you to a plausible claim. But even if they did that, there's absolutely nothing in there that would defeat the presumption of prosecutorial independence. If there was a common goal to undermine the plaintiff's constitutional rights with respect to the federal prosecutors alone, let alone with respect to any state actors, none of which, unless I'm missing something in the complaint, there's no specific allegations with respect to state actors, certainly not with respect to state prosecutors, that at all, none of them are even named. So, unless your honors have any questions for me, I'm happy to rest on my papers. All right, thank you very much, Mr. Johnson. Thank you. And finally, we'll hear from Mr. Malloy. Thank you, if it pleases the court. I'm here on behalf of Independent Health and another entity, IPA Western New York, which is an entity that is not addressed in any way in any of the factual pleadings in this case. I'm not going to add any substantive argument here. I believe that the arguments made by counsel for the other appellees applies in equal force as it does to Independent Health. What I will say, your honors, in addition, there's an additional basis here to uphold the dismissal of the Independent Health entities. This is a case that, as pled, is against one of the insurers. There are no factual allegations in this case of an Independent Health employee participating on the task force. There are no allegations of self-congratulatory emails amongst Independent Health employees. There are no allegations about any perjured testimony, any false testimony, any activities at all on behalf of Independent Health that would support any claim in this case. So in addition to the substantive arguments already advanced, your honor, an additional basis to uphold dismissal of the Independent Health entities is that these pleadings simply do not support any claim against them. Thank you. All right. Thank you very much. That brings us back to you, Mr. Walsh, for three minutes of rebuttal. Thank you, your honor. First, I'd like to address the idea that there was no allegation of state action. There is. The state Medicaid fraud unit was part of the task force group, did the raid jointly with the FBI in 2013, brought a state prosecution that was dismissed shortly after the federal prosecution. And they were all in lockstep, the state and the feds on this case. So the idea that, I understand the Bivens action, we're not suing the federal government. It would have been pointless to categorize it that way. So anyway, the second thing, there were plenty of allegations of what happened in 2012 and 2013. Starting at paragraph 38 of the complaint, after the meeting that he had with Blue Cross, he corresponded with them through 2012, and there's allegations down to paragraph 43 about that. Back on the next page, paragraph 47 to 49 of the complaint, at page 25 of the record of his communications with the other defendants about trying to sort out these codes. And those are specific allegations with respect to independent health and Univero. And then the raid, of course, is alleged in paragraph 53, which happened in 2013 with the Medicaid fraud unit. So, this was an ongoing process, starting with what he thought was a discussion after they came to see him about what to use for a proper code. Meanwhile, while he's trying to talk it out with them, they're going in their task group because they can, because they're in the task group. They've set it up. And other people don't have access like that. It's not like a normal one-off complaint, somebody provides false information, you can't sue them. This isn't like that at all. But why is it, as a qualitative matter, any different than just a witness or an insurance carrier witness coming in and saying to a task force that they're not a part of. That this is what we've observed, or this is what we have found. Because, and I think a plausible inference can be drawn, that's why I cited Dean Abramofsky's article about this. That the creeping influence of the insurance companies with prosecutors in these task forces and these special investigation units creates a problem and it impacts the independence of the prosecutor. So, creating a unit, a task force unit that involves people who are trying to make money on these things is a problem. It's not like a task force for human trafficking where people are trying to prevent suffering for people. They have no ulterior motive. They wanted to be on this task force because they wanted to have this influence so they could do exactly what they did. And when it goes wrong, they run for cover. And that's the problem, Judge. Thank you. Well, thank you all. We will reserve decision. That concludes the arguments on the calendar for today. Let me thank our courtroom deputy, Ms. Beard. And with that, Ms. Beard, you can adjourn court. Thank you. Thank you. Court stands adjourned.